Filed 8/4/16  P. v. Means CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>LAURA LEESHA MEANS,<br><br>　　Defendant and Appellant. | 2d Crim. No. B260374<br>(Super. Ct. No. 2010021196)<br>(Ventura County) |

A jury convicted Laura Leesha Means of one count of grand theft (Pen. Code § 487, subd. (a);[1] count 1) with an enhancement for loss in excess of $150,000 (§ 12022.6, subd. (a)(2)); 12 counts of money laundering (§ 186.10, subd. (a); counts 3 through 14); two counts of filing false income tax returns (Rev. & Tax Code § 19705, subd. (a)(1); counts 27 and 28); and two counts of filing false or fraudulent returns with the intent to evade taxes (*Id*., § 19706; counts 29 and 30).

The jury was unable to reach a verdict on count 2 (grand theft) and counts 15 through 26 (money laundering).  After the trial court declared a mistrial as to those counts, Means pled no contest to those counts.  The court sentenced Means to 15 years 8 months in state prison.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

We reverse counts 4, 6 through 10, and 12 through 14 for lack of substantial evidence. In all other respects, we affirm.

FACTS

Means was a former law enforcement officer and a licensed real estate agent. In 2006, she purchased a six-acre undeveloped parcel of real property near Marissa Lane in Camarillo. She hoped to develop the parcel into four lots and sell them.

To facilitate the purchase, Means borrowed $300,000 from real estate investor, John Maddux, who agreed to purchase one of the lots. Means also applied to Countrywide Home Loans for a mortgage in the amount of $534,584. In her Countrywide loan application, Means stated that no part of the down payment for the purchase of the parcel was borrowed.

Means placed into escrow $10,000 of her own money and $138,000 of the Maddux loan. The balance of the purchase was paid by the proceeds of the Countrywide loan. Countrywide's mortgage encumbered the entire six-acre parcel.

GRAND THEFT OF RAY STUMP'S AND WILLIAM CLAYTON'S MONEY

(Counts 1 and 2)

In 2007, Means ran an advertisement for the sale of one-acre lots at "half price, $300,000." Ray Stump responded to the advertisement. Means told Stump she was a retired police officer. This caused Stump to trust her. She told Stump she planned to divide the six-acre parcel into four lots. She told him she was selling the lots at half price because she needed the money to complete the infrastructure on the land. She mentioned she needed the funds to complete the infrastructure on at least three or four occasions. Based on these statements, Stump believed Means would use his purchase money to pay for infrastructure.

On September 21, 2007, Stump and Means entered into an agreement for the purchase of lot 2 for $300,000. The agreement provided that $285,000 of Stump's money would be released from escrow upon "removal of all contingencies or no later than September 28, 2007." Stump agreed to the release of the funds prior to the close of escrow because Means had emphasized she needed the money for the infrastructure. Stump would

2

not have agreed to release the money had he known she would use it to pay her personal expenses. The agreement further provided that if the recordation of the parcel map took longer than 180 days, Stump had "the unconditional right to renew this agreement or cancel with a full refund of moneys paid through escrow."

Stump deposited $285,000 into escrow and signed an escrow instruction allowing the money to be released to Means. The money was transferred to Means's Washington Mutual bank account. Immediately prior to the deposit of Stump's money, Means's bank account had a balance of $514.76. Of the $285,000, less than 2 percent, or $5,018.07, was spent on the project.

On July 30, 2008, a restrictive covenant was recorded on the property after the county determined the property was within an ecologically significant habitat.

In August 2008, William Clayton and his wife were looking for land on which to build a house. Clayton met with Means and told her he was interested in lot 1. Means told him each lot was worth $500,000, but she was selling them at a discount because she needed money to finish the project. Means did not mention that the property was encumbered by a trust deed securing a loan in excess of $500,000. Nor did she tell him that she lied on the loan application. Clayton would not have purchased the property had he known these facts. Means also failed to mention the property was encumbered by a restrictive covenant.

Clayton decided to purchase lot 1. Means told him the purchase price must be released from escrow early because she needed the money to complete the project. Means's representation that the money would be used to complete the project was the only reason Clayton agreed to release the money early. Had he known she would use the money to pay her personal expenses, he would not have agreed to release the money from escrow early.

On August 28, 2008, Clayton and his wife signed a contract to purchase lot 1 from Means for $295,000. The contract required Clayton to unconditionally release $285,000 from escrow within three days. On September 4, 2008, the $285,000 was wired from escrow into Means's bank account. Immediately prior to the deposit of Clayton's

3

money, Means's bank account had a balance of $15,869.70. Clayton never received title to lot 1. Means spent $148,869.70, or 52 percent, of Clayton's money on the project.

Means never completed the project. Nor did she return any of Stump's or Clayton's money. Instead, she filed for and received a discharge in bankruptcy. Means's debts to Stump and Clayton were among those discharged in bankruptcy. Bank of America acquired the Countrywide loan encumbering the property and foreclosed.

## MONEY LAUNDERING
### (Counts 3 through 26)

The 23 counts of money laundering are based on money transferred from Means's bank account either by check or by wire. Each transfer from Means's account was treated as a separate count.

Means used the money deposited by Stump and Clayton to make mortgage payments on her personal residence and on other private loans unrelated to the project. In addition, Means used the money to purchase such items as a new refrigerator, hardwood floors and cabinet resurfacing for her personal residence.

## TAX EVASION
### (Counts 27 through 30)

John Jacobs, a certified public accountant, prepared Means's tax returns for 15 years, including 2007 and 2008. Means used the cash method of accounting; that is, the taxpayer recognizes income as she receives it and expenses as she pays them.

Jacobs uses a tax organizer. The organizer shows the amounts entered the previous year for various items and has space to enter the amounts for the present tax year. Jacobs did not recall Means telling him that she received $285,000 from Stump in 2007 and $285,000 from Clayton in 2008. If she had mentioned it, Jacobs would have entered the amounts in the organizer. If Means had told Jacobs about the sales, he would have requested documents and copies of the documents would have been in his files. Jacobs did not have such documents.

Frances Gutierrez is a special agent and former auditor for the California Franchise Tax Board. She reviewed Means's 2007 and 2008 tax returns. Means did not

report the money she received from Stump and Clayton. Means had a duty to report the amounts she received as income on her 2007 and 2008 returns.

DEFENSE

Means testified on her own behalf. She said she became a real estate agent in 2001. She was very successful. By 2005, she and her husband had a combined income of $600,000 to $800,000 per year.

Initially, Means listed the Marissa Lane property for the owners. She decided to purchase the property for $700,000. She had no experience in land development, but she thought she could subdivide the property.

In order to purchase the property, she applied for a $525,000 loan from Countrywide. At the time she applied, Maddux had not made an offer to purchase a parcel.

Maddux agreed to purchase a parcel in May of 2006 for $300,000. An addendum to the agreement described the transaction as a loan for the acquisition and development of the property. Means signed a promissory note. In spite of the language in the agreement describing the transaction as a loan and the promissory note, she considered the transaction a sale. Means did not read the Countrywide document before signing it. She did not intend to misrepresent anything.

Means told Stump that she and her husband were "low on funds," and that she would use his money to pay her mortgage and personal bills. She would not have used his money if she did not think it was hers. A development attorney advised her that the funds were hers to use for any purpose.

Means also told Clayton that she was low on funds, that she had monthly property payments of $20,000 and that her real estate income was "way, way down." She told Clayton that she would use his money immediately. She never told Clayton that she would use his money solely for the project.

Means attributed her inability to complete the project to delays caused by heavy rains, unexpected drainage and erosion problems and the bankruptcy of her excavation contractor.

5

Alan Wallace, a real estate broker and attorney, reviewed the documents relating to the Stump and Clayton transactions. He testified that the language of the agreements about the unconditional release of the money is "very clear." Under the agreement, the released funds became Means's money. Even if Means told the buyers the money would be used on the development project, the language of the agreement controls.

Philip Garrett Panitz is a tax attorney and certified tax specialist. He testified if funds were unconditionally released to Means and she spent them on personal bills, it would not be a taxable event if she had an obligation to repay. It would be a taxable event if there was no obligation to repay. Means testified she did not believe she had the obligation to report the money she received from the escrows because the transactions were loans.

Means presented a number of witnesses who testified to her reputation for honesty and veracity.

DISCUSSION

I

Means contends her convictions for money laundering and filing false tax returns are not supported by substantial evidence.

In reviewing the sufficiency of the evidence, we view the evidence in a light most favorable to the judgment. (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) We discard evidence that does not support the judgment as having been rejected by the trier of fact for lack of sufficient verity. (*People v. Ryan* (1999) 76 Cal.App.4th 1304, 1316.) We have no power on appeal to reweigh the evidence or judge the credibility of witnesses. (*People v. Stewart* (2000) 77 Cal.App.4th 785, 790.) We must affirm if we determine that any rational trier of fact could find the elements of the crime beyond a reasonable doubt. (*Johnson*, at p. 578.)

(a) Money Laundering

Section 186.10, subdivision (a) provides in part that money laundering occurs when a person conducts or attempts to conduct one or more transactions through one or more financial institutions within a seven-day period involving a "monetary

6

instrument or instruments of a total value exceeding . . . $5,000" with either the specific intent to promote or facilitate criminal activity or the knowledge that "the monetary instrument represents the proceeds of, or is derived directly or indirectly from the proceeds of, criminal activity . . . ."

Means argues that she did not try to conceal any of her expenditures. But an attempt to conceal is not an element of money laundering.

Means argues that there is insufficient evidence of money laundering for those counts in which she used personal checks. She points out that under section 186.10, subdivision (a) money laundering requires the use of a "monetary instrument." Section 186.9, subdivision (d) provides "'monetary instrument' . . . does not include personal checks which have been endorsed by the named party and deposited by the named party into the named party's account with a financial institution." She points out there is no evidence that the checks she wrote were not deposited by the named party into that party's account at a financial institution.

The People concede that Means is correct regarding the transactions she conducted by personal check. These transactions involve counts 4, 6 through 10, and 12 through 14. But as the People point out, not all of Means's transactions involved a personal check. Some were electronic transactions to which section 186.10, subdivision (a) applies. In addition, Means pled no contest to counts 15 through 26. A plea of no contest waives a claim of insufficient evidence. (*People v. Palmer* (2013) 58 Cal.4th 110, 114.)

We reverse counts 4, 6 through 10, and 12 through 14.

(b) Tax Evasion and Fraud

Revenue and Taxation Code section 19705, subdivision (a)(1) provides any person who "[w]illfully makes and subscribes any return, statement, or other document, that contains or is verified by a written declaration that it is made under penalty of perjury, and he or she does not believe to be true and correct as to every material matter" is guilty of a felony.

7

Revenue and Taxation Code section 19706 provides in part, "Any person . . . who, . . . willfully fails to file any return or to supply any information with intent to evade any tax . . . , or who, willfully and with like intent, makes, renders, signs, or verifies any false or fraudulent return or statement or supplies any false or fraudulent return or statement or supplies any false or fraudulent information" is guilty of a felony or a misdemeanor.

Means argues her early receipt of funds from escrow was not a taxable event and she had an obligation to repay the funds on request.

But the People's tax expert, Frances Gutierrez, testified Means had a duty to report the amounts she received from Stump and Clayton on her 2007 and 2008 tax returns.

In any event, the Stump and Clayton transactions were structured as sales, not loans. The jury could reasonably conclude Means's promises to repay were fraudulent. At the time Means made the promises, she was, by her own admission, in poor financial condition. She had no means of repaying the money.

Means argues that Revenue and Taxation Code section 19706 is a lesser included offense of Revenue and Taxation Code section 19705.

A defendant cannot be convicted of both a greater and a necessarily lesser included offense for a single act or course of conduct. (*People v. Busch* (2010) 187 Cal.App.4th 150, 160.) If the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the later is necessarily included in the former. (*People v. Shockley* (2013) 58 Cal.4th 400, 406.)

Revenue and Taxation Code section 19706 requires that the person acted with the intent to unlawfully evade paying a tax; whereas section 19705 does not. Section 19705 does not contain the same elements as section 19706. Section 19706 is not a lesser included offense.

Means's reliance on *People v. Hagen* (1998) 19 Cal.4th 652, is misplaced. There the court held that former Revenue and Taxation Code section 19401, subdivision (a) was a lesser included offense of former Revenue and Taxation Code section 19405,

subdivision (a)(1). (*Hagen.* at p. 667.) Former section 19405, subdivision (a)(1) was re-enacted as section 19705, subdivision (a)(1). But former section 19401, subdivision (a) was re-enacted as section 19701, subdivision (a), not section 19706. Thus, *Hagen* does not involve one of the statutes at issue in this case.

## (c) Grand Theft

Means contends her grand theft convictions are not supported by substantial evidence in that there is no evidence she intended to permanently deprive Stump or Clayton of their money.

The People proceeded under two theories of grand theft: theft by false pretenses and embezzlement. Neither false pretenses nor embezzlement require the intent to permanently deprive the owner of his property. (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1248-1249, fn. 5 [false pretenses]; *People v. Nazary* (2010) 191 Cal.App.4th 727, 742 [embezzlement].)

In any event, Means pled no contest to the theft of Clayton's money. Means cannot challenge the lack of evidence to support that count. (*People v. Palmer*, *supra*, 58 Cal 4th at p. 114.)

## II

Means contends the trial court erred by making inappropriate comments.

### (a)

Means argues the trial court improperly challenged the veracity of her attorney in front of the jury.

Means's counsel was cross-examining district attorney investigator Frank Huber. Counsel asked Huber, "Can you point out anywhere in Mr. Stump's contract where it says $175,000 is needed for infrastructure?" Huber replied that he did not have the contract in front of him. Counsel directed Huber to an exhibit containing the contract. The prosecutor objected under Evidence Code section 352 that reading the contract would take too much time. The trial court asked defense counsel whether there was a particular portion of the contract he wanted Huber to examine. Defense counsel replied, "Point of

9

this, your Honor, is to show that it's not in the whole contract." The court stated, "Now, that, as a matter of fact, is untrue . . . ."

The trial court met with the attorneys outside of the presence of the jury. The court stated that a contract addendum referenced infrastructure. Defense counsel replied that he was asking whether the contract provided for a specific amount of money. The court said it would ask Huber to review the contract. When the trial resumed, defense counsel asked Huber, "And in Mr. Stump's contract, is there anything in it, any verbiage at all, about releasing $175,000?" Huber responded, "No."

It would have been better had the trial court not asserted, in front of the jury, that defense counsel's statement was untrue. Nevertheless, any error was harmless. When trial resumed and defense counsel repeated the question to Huber, the jury would understand that the court was mistaken. Defense counsel's statement was not untrue. Moreover, the court instructed the jury, "Do not take anything I said or did during the trial as an indication of what I think about the evidence, the witnesses, or what your verdict should be." (CALCRIM No. 3530.)

The trial court commits misconduct if it "'persists in making discourteous and disparaging remarks to a defendant's counsel.'" (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1320.) The court's single brief comment could not have prejudiced Means. (*Id*. at p. 1321.)

(b)

Means contends the trial court gratuitously undermined the opinion of her expert, Alan Wallace.

During cross-examination of Means's real estate expert, the prosecution asked the expert about a provision in a document. The trial court stated that the provision is ambiguous, "[b]ut Mr. Wallace may be able to give us some insight . . . ."

Far from undermining Means's expert, the trial court suggested that the expert might be able to clarify an ambiguous document.

(c)

10

Means contends the trial court decimated her credibility by stopping the proceedings to label her unreasonable.

Means testified she received a "lender's acknowledgment." She said it was her belief that the lender's acknowledgment authorized the release of the loan on three of the parcels and that it would remain on only one parcel. At that point the trial court asked to see the document. After reviewing the document, the court stated in the presence of the jury, "Another event had to occur before approval would occur. It would be unreasonable to conclude that this document granted approval. The language of the document so states."

Means objected to the trial court's comment and asked for a mistrial. The court denied the motion.

When trial resumed the following Monday, the trial court instructed the jury as follows: "So throughout this trial the Court has informed the jury that what lawyers and what judges say is not evidence, and that's true. That's accurate, what I told you. During the testimony last Friday, the Court misspoke when I expressed to you that Exhibit 165A could not reasonably be interpreted as loan approval. The issue of whether or not Ms. Means reasonably believed this document provided loan approval is a question for you, not a question for the Court. You'll consider all the evidence. You'll decide whether or not you've received evidence that persuaded you that she reasonably believed she had loan approval. That's a subject for you. They jury is the exclusive entity to determine the reasonableness of Ms. Means's interpretation of this document. And please disregard any comment I made with respect to that subject."

"'[The] trial court may comment on the evidence, but such comments "must be accurate, temperate, nonargumentative, and scrupulously fair."'" (*People v. Pearson* (2013) 56 Cal.4th 393, 444.) Here the court's comment on the evidence was accurate, temperate, nonargumentative and scrupulously fair. The court did not err.

In any event, had the trial court erred, its comments to the jury would have eliminated any possibility of prejudice.

(d)

11

Means contends the trial court's comments outside the presence of the jury demonstrated bias against her.

During the direct examination of Means, the trial court sustained numerous objections to her answers as non-responsive. After Means volunteered information that the court stated was "not even close to the question," the court excused the jury. Outside the presence of the jury, the court stated, "I believe it's a further effort on the part of Ms. Means to attempt to subvert the process of the court . . . ." The court warned Means that if she continued, it would hold her in contempt.

In another instance, during cross-examination, the prosecutor asked Means if she had a copy of a document. Means replied she would have to look. The prosecutor suggested that she had known about the trial for five years. Means replied, "No. You just added this on because I wouldn't take your last deal." The trial court granted the prosecutor's motion to strike the answer.

Outside the presence of the jury, the trial court stated: "Ms. Means is again working to subvert the process. She's volunteering information that she has to know, has to know is not admissible. Offers of settlement are not admissible. . . . [P]erhaps Ms. Means wants to portray to the jury that she's not smart enough to understand this process. I am required as a matter of fact to make an assessment. I find as a matter of fact she understands exactly what we're doing here and that she's working to subvert the process. She's volunteered information that is completely and totally inappropriate."

The trial court found Means in contempt and fined her $500.

The trial court did not exhibit bias against Means. The court simply performed its duty to control Means's attempts at subverting the process of the trial. Far from exhibiting bias, the court would have been remiss had it not admonished Means.

Means claims the trial court's bias against her was evident at sentencing. Initially the court stated its tentative sentencing decision was 11 years. After argument, the court declared it undervalued the sentence and increased it from the tentative to 15 years 8 months.

12

But an increase from an announced tentative sentence does not show bias against the defendant. The trial court announced the sentence was tentative because it was open to further consideration of the appropriate sentence.

III

Mean contends the trial court erred in excluding a large number of emails. Means claims the emails show her intent to complete the project.

Means moved to admit a stack of emails. Means refers to the stack as exhibit B. The prosecution objected that the emails were hearsay. Means responded that they were not being offered for the truth of the matter asserted. Instead, they were being offered to show Means's state of mind, that she intended to complete to project.

The trial court found the emails to be irrelevant. The court stated it assumed Means always intended to complete the project. But if she spent Stump's and Clayton's money for her personal benefit, knowing she had no authority to do so, a crime was committed even if she intended to complete the project. The court also found the emails were inadmissible under Evidence Code section 1250, subdivision (b), making inadmissible a statement of memory or belief to prove the fact remembered or believed.

The trial court noted it was not asked to review any particular email. Nevertheless, Means argues on appeal the trial court erred in excluding emails from a member of an engineering firm, an email from the supervising broker at Means's real estate firm, as well as emails from herself to the county and her attorney.

Of course, emails sent from persons other than Means do not reflect Means's state of mind. Assuming emails sent by Means reflect her intention to complete the project, they are irrelevant. The question at trial was whether Means obtained money from Stump and Clayton by falsely promising their money would be used to complete the project. That Means's ultimate goal was to complete the project would not be a defense to obtaining money from Stump and Clayton through false pretenses or embezzlement.

IV

Means contends the trial court erred in admitting evidence of an unrelated transaction.

13

The evidence involved a transaction between Means and Christopher Consolo. Means owned a kennel at which Consolo worked. Means agreed to sell Consolo the kennel and its surrounding five-acre parcel for $1.1 million. The agreement required Consolo to deposit $85,000 into escrow. Escrow would remain open for six months while Consolo looked for financing. But the agreement required Consolo to release $50,000 to Means within three days of the agreement. The agreement stated that the $50,000 was not refundable. Consolo deposited $85,000 into escrow and $50,000 was released to Means prior to close of escrow. Ultimately the transaction fell through and Means repaid the $50,000 to Consolo.

The People made a motion to introduce the evidence as evidence of prior conduct pursuant to Evidence Code section 1101, subdivision (b). The People argued the evidence is relevant to show intent and motive. Means objected under Evidence Code section 352 that its probative value is outweighed by the undue consumption of time. The trial court granted the People's motion.

Evidence Code section 1101 provides: "(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion. (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act. (c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

Means argues the evidence should have been excluded under Evidence Code section 1101, subdivision (a). In order to be admissible under subdivision (b), the

14

evidence must not only demonstrate a similar result, but also a concurrence of common features. (Citing *People v. Ewoldt* (1994) 7 Cal.4th 380, 393.)

Means asserts the Consolo transaction is not similar to the Stump and Clayton transactions because Means repaid Consolo. By the same token, any error in admitting the evidence is harmless. In fact, the evidence can be viewed as beneficial to Means. That she returned Consolo's money tends to show she was not acting with wrongful intent when she took money prior to the close of escrow in transactions with Stump and Clayton. In other words, the evidence of the Consolo transaction made Means look honest. In any event, if the evidence did not help Means, at worst it did not harm her. There is no reasonable probability that Means would have obtained a more favorable result had the evidence been excluded. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

V

Means contends the trial court erred in giving the "failure to explain or deny" instruction.

CALCRIM No. 361 provides: "If the defendant failed in her testimony to explain or deny evidence against her, and if she could reasonably be expected to have done so based on what she knew, you may consider her failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt. [¶] If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

Our Supreme Court recently discussed the circumstances under which the instruction is properly given in *People v. Cortez* (2016) 63 Cal.4th 101. The court rejected the People's argument that the instruction applies where the defendant's testimony contains logical gaps, creates conflict with other evidence or is bizarre, implausible or nonresponsive. (*Id*. at p. 117.) Instead, the court held the instruction applies "only when a defendant completely fails to explain or deny incriminating evidence, or claims to lack knowledge and it appears from the evidence that the defendant could reasonably be expected to have that knowledge." (*Ibid*.)

15

Means argues it was error to give the instruction because she explained all the evidence against her. But the People point out that Means failed to explain why anyone who is trying to purchase a lot in the project would agree his down payment could be used to pay her personal expenses instead of completing the project. We agree with the People that the instruction was properly given.

In any event, if it was error to give CALCRIM No. 361, the error was harmless. The instruction does not say that Means, in fact, failed to explain or deny any evidence against her. The instruction states, "If the defendant failed . . . to explain or deny evidence against her . . . ." Thus if Means is correct, that she explained all the evidence against her, the jury would not apply the instruction. The court expressly instructed the jury, "Some of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." (CALCRIM No. 200.)

Moreover, the instruction states that the failure to explain or deny is not enough by itself to prove guilt; the People must still prove guilt beyond a reasonable doubt; and that is up to the jury to decide the meaning and importance of any such failure. For these reasons courts routinely conclude any error in giving the instruction is harmless. (*People v. Lamer* (2003) 110 Cal.App.4th 1463, 1472 [not a single case in which error in giving instruction deemed prejudicial].) Nor is it prejudicial here.

VI

Means contends punishment on her money laundering convictions should have been stayed pursuant to section 654.

Section 654, subdivision (a) prohibits multiple punishments for an "act or omission that is punishable in . . . different provisions of law. . . ." Section 654 applies to acts committed within an indivisible course of conduct that has a single criminal objective. (*People v. Goode* (2015) 243 Cal.App.4th 484, 492.) A course of conduct that is divisible in time, although directed at a single objective, may give rise to multiple violations and punishments. (*Ibid.*)

16

Means argues that her theft and money laundering convictions constitute an indivisible course of conduct. But the thefts were complete when the money was transferred into Means's bank account. Thereafter Means had sufficient time to reflect each time she spent the money on herself instead of the development project. Means's course of conduct was divisible in time. The trial court properly determined that section 654 does not apply.

Means's reliance on *People v. Conners* (2008) 168 Cal.App.4th 443 is misplaced. In *Conners*, the defendant received and cashed five checks representing stolen funds. He was convicted of receiving stolen property and money laundering. The Court of Appeal determined that section 654 applied because receiving and cashing the checks constituted an indivisible course of conduct. (*Id*. at p. 458.)

To the extent *Connors* may be read as holding that the single act of cashing the checks constitutes both receiving stolen property and money laundering, we have no quarrel with the result. But to the extent *Conners* can be read as holding that a criminal act such as theft and thereafter spending the proceeds of the criminal act constitute an indivisible course of conduct, we disagree. The theft and the money laundering are different crimes separated by time.

VII

Means contends her convictions are the result of ineffective assistance of counsel.

A defendant claiming ineffective assistance of counsel has the burden of showing counsel's representation fell below an objective standard of reasonableness, and but for counsel's unprofessional errors, the result would have been more favorable to the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Mayfield* (1993) 5 Cal.4th 142, 185.) Where the record does not show why defense counsel acted or failed to act in a professional manner, the conviction must be affirmed unless counsel was asked for an explanation and failed to provide one, or there could be no satisfactory explanation. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.) The prejudice prong requires the defendant to show but for counsel's errors there is a reasonable probability the

17

defendant would have obtained a more favorable result.  (*In re Wilson* (1992) 3 Cal.4th 945, 950.)

During a break in the trial, Means's counsel stated that Means just provided him with discovery Means believes the prosecution should have.  The trial court stated defense counsel is holding a stack of documents that appears to be at least six inches thick.  The court stated the documents should have been offered to the prosecution months, if not years, prior to trial.  Means stated she gave the documents to her counsel six months ago.  Defense counsel stated it was a matter of miscommunication.  Counsel was not aware Means intended to give all of the documents to the prosecution.  Defense counsel and the prosecutor agreed that some of the material was duplicative of documents the prosecutor already had.  The court ruled the material the prosecutor does not have is inadmissible under discovery statutes.  (§ 1054 et seq.)

On appeal, Means refers to the excluded documents generally, without specifying or describing them.  To the extent the documents include the emails the parties refer to as exhibit B, the trial court properly ruled them irrelevant.  To the extent Means may be referring to some other documents, we do not know what those other documents are.  Thus Means has failed to show reversible error.

Counts 4, 6, 7, 8, 9, 10, 12, 13, and 14 are reversed.  In all other respects, we affirm.

NOT TO BE PUBLISHED.


GILBERT, P. J.

We concur:


YEGAN, J.


TANGEMAN, J.


18

Kent M. Kellegrew, Judge

Superior Court County of Ventura

_____


Ferguson Case Orr Paterson LLC, Wendy C. Lascher, and Joshua S. Hopstone for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Rodarmel, Jr., Supervising Deputy Attorney General, and Stephanie A. Miyoshi, Deputy Attorney General, for Plaintiff and Respondent.